**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond WONG, Defendant–Appellant.**

**No. 02–10070.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 2002.

Filed June 26, 2003.

---

Arthur Wachtel, Esq. and James P. Collins, Esq., San Francisco, California, for the Appellant.

Amber S. Rosen, Assistant United States Attorney, San Jose, California, for the Appellee.

Before BRUNETTI, TASHIMA, Circuit Judges, and EZRA,* District Judge.

**OPINION**

BRUNETTI, Circuit Judge:

Appellant Raymond Wong pleaded nolo contendere to violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), statutes prohibiting the receipt and possession of

* The Honorable David A. Ezra, Chief Judge, United States District Court for the District of Hawaii, sitting by designation.

child pornography. On February 8, 2002, Wong was sentenced to 27 months' imprisonment. Police discovered the evidence related to the child pornography charges when they executed a series of search warrants at Wong's home and on his computers in connection with the disappearance and murder of Wong's live-in girlfriend Alice Sin. Wong preserved the right to appeal the district court's denial of his motion to suppress the evidence retrieved pursuant to three search warrants dated January 26, 2000, January 28, 2000, and February 2, 2000. Wong now appeals the district court's denial of his motion to suppress. Wong claims the warrants lacked probable cause, were overbroad, and were fruit of the poisonous tree. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's denial of the motion to suppress.

I.

On November 22, 1999, Wong reported to the Pinole, California Police Department that his live-in girlfriend Alice Sin had been missing since the previous day. Wong initially told police that he and Sin were married, when in fact, they were not. Sin was pregnant at the time of her disappearance, a fact Wong did not tell police until days after he reported her missing. Pinole officers investigated Sin's disappearance, and, on November 24, discovered her car one-half mile from the home she shared with Wong. Police cadaver dogs detected decaying human flesh in the trunk of Sin's car. During a consensual search of Wong's home, police noticed a nine millimeter gun in his closet. Officers also learned that Wong and Sin fought in the months prior to her disappearance. Wong's other girlfriend Jessica Tang,

mother of his infant daughter, began staying at Wong's home when Sin disappeared. Pinole officers discovered that Tang had threatened Sin shortly before her disappearance. On November 30, 1999, Wong agreed to take a polygraph test administered by a Contra Costa County senior inspector. The polygraph results showed that Wong was over 99% deceptive when he answered "no" to the questions "Do you know what happened to Alice Sin?" and "Are you lying about what happened to Alice?" On January 24, 2000, Sin's body was discovered in Churchill County, Nevada. Sin had been shot twice in the head, once in the back, and once under her arm. Nine millimeter shell casings were found near her body. Police also found Monopoly money marked with the letters "NWO" and "ZOG," letters commonly used by white supremacy groups, near Sin. Because of the evidence gathered during the investigation, Pinole police applied for a warrant to search Sin and Wong's house.

On January 26, 2000, Pinole Sergeant Carmichael presented to the magistrate judge a search warrant, affidavit, and statement of probable cause to search Wong's house and cars. The preface of the search warrant limited the seizure to items used to commit a felony, or evidence that tended to show a felony had been committed or a particular person committed the felony. Sergeant Carmichael specified in the search warrant that he would be looking for "[a]ny writings or documents which display the letters 'NWO' and 'ZOG' "; "[a]ny maps, reciepts [sic], or writings, depicting Churchill County Nevada"; and "[a]ny and all identification and documents belonging to Alice Sin." Sergeant Carmichael additionally requested, in Item Nine of the warrant, to search the computers, their components, and disks to "obtain data as it relates to this case." In his statement of probable cause, Carmichael asserted that he believed probable cause

existed to search Wong and Tang's home and cars for evidence of murder. The warrant issued and the police recovered many items from Wong's home, including the computers the search of which Wong challenges in this appeal.

On January 28, 2000, Sergeant Carmichael presented a new search warrant and "Addendum to Search Warrant—Statement of Probable Cause" ("Addendum") to search the computers, two Palm Pilots, a computer tower, and six laptops recovered on January 26, seized pursuant to the first warrant. He included the January 26 warrant and statement of probable cause when presenting the second warrant to the magistrate judge. The Addendum presented on January 28 provided further justifications to search the seized computers. Sergeant Carmichael indicated in the Addendum that Alice Sin kept personal information in the Palm Pilots. Sin also used the computers for email and writing. During the search of Wong's house on January 26, Sergeant Carmichael noticed software for online services. As indicated in the Addendum, in his training and experience, Sergeant Carmichael realized that people can use the internet to make travel reservations and research items such as white supremacy groups. On January 28, the magistrate judge added a handwritten notation to the attached first warrant indicating that the "[i]tems described in Addendum, Search Warrant 2" could be searched. The magistrate judge signed the second warrant.

At the request of Sergeant Carmichael, and pursuant to the January 28 search warrant, Wilson Van Alst, a Special Agent with the California Department of Justice and computer forensic specialist, searched Wong's computers for maps and writings related to Churchill County, Nevada; information related to nine millimeter firearms; references to or depictions of Mo-

nopoly money; Sin's documents; and files containing the symbols "NWO" and "ZOG." Van Alst determined that the items for which he was searching could be in plain text, special text, or graphics files. Specifically, Van Alst believed that any Churchill County maps, depictions of Monopoly money, or references to "NWO" or "ZOG" downloaded from the internet would be located in graphics files. After he began his search of the graphics files, Van Alst discovered child pornography. He made a note of the pornography files' location, and continued with his search for evidence related to Sin's murder. Van Alst's written report, dated March 6, 2000, indicated that he had discovered on Wong's computers numerous images of children as young as age three engaged in sexual acts with other children and adults.

After execution of the January 26 warrant, Sergeant Carmichael discovered that Wong, who was in Canada on business for his employer Safeway Corporation ("Safeway"), told his colleagues that he would not be returning to California because of the investigation into Sin's death. Wong failed to return to work at the Canadian Safeway and left behind a Dell laptop computer that a Canadian Safeway employee mailed to a Safeway store in California. The computer had the same type of disks as those found in Wong's home. On February 2, 2000, Sergeant Carmichael applied for a third warrant, which included a request to search the computer, located at Safeway, for "any and all computer files whether text or image," the associated disks, and the carrying case for the computer. The affidavit for the search warrant specifically incorporated the attached statement of probable cause. The attached statement of probable cause indicated that Sergeant Carmichael had discovered child pornography on the computers searched pursuant to the January 28

warrant, and believed probable cause existed that child pornography would be on the laptop. The magistrate judge signed the third warrant. After the execution of the February 2 warrant, Sergeant Carmichael discovered that the laptop computer specified in the warrant belonged to Teligent Corporation ("Teligent"), Wong's former employer. Because Wong no longer worked for Teligent in January 2000, Teligent's attorney claimed that Wong had no right to the computer and that Teligent considered it to be stolen property.

On March 16, 2000, Wong was indicted on child pornography charges. On April 28, 2000, Wong filed a motion to suppress related to the evidence recovered during the search of Wong's house and computers. On November 6, 2000, the district court denied the motion as to the January 26, January 28, and February 2, 2000 search warrants. Wong pleaded nolo contendere to the charges, but reserved his right to appeal the denial of his motion to suppress.

## II.

On appeal, Wong claims that the January 26, 2000 warrant lacked probable cause and specificity. He asserts that the January 28, 2000 warrant was both fruit of the poisonous tree and overbroad. Finally, he claims that the February 2, 2000 warrant was fruit of the poisonous tree. The government contests Wong's standing to appeal the search of the computer in the February 2 warrant.

## A.

First, Wong contends that the January 26 warrant lacked both probable cause that evidence of criminal activity would be found on the computers and specificity. We review a magistrate

judge's finding of probable cause to issue a search warrant for clear error. *United States v. Patterson*, 292 F.3d 615, 625 (9th Cir.2002). Probable cause is determined by looking at the totality of circumstances. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause exists if "it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Peacock*, 761 F.2d 1313, 1315(9th Cir.1985). We must find that the magistrate judge issuing the warrant had a substantial basis for determining probable cause existed. *Id.*

■ Alice Sin disappeared and was later found murdered. When Wong first reported Sin missing, he withheld information from the police. Wong also appeared deceptive during a polygraph test when asked about Sin's murder. Although Sin shared a home with Wong in California, and her car was found near that home, her body was discovered in Churchill County, Nevada. Sin had been shot four times and nine millimeter shell casings were found near her body. Monopoly money marked with the letters "NWO" and "ZOG" were also found near her body. During a consensual search of Wong's home, Sergeant Carmichael had seen a nine millimeter gun in Wong's bedroom. Tang, Wong's second girlfriend, had moved into Sin and Wong's home shortly after Sin disappeared. Sin and Wong had argued in the months before her disappearance and Tang had threatened Sin.

Sergeant Carmichael's affidavit provided detailed evidence connecting Wong to Sin's disappearance. Wong concedes in his brief that each category in the January 26 warrant, except Item Nine related to the computers, is "directly connected" to Carmichael's probable cause statement. We disagree with Wong's contention that Carmichael's affidavit fails to connect the items listed in the warrant to the computer. As determined by the district court, Item Nine allows a search of the computers for "data as it relates to this case," which connects the search of the computers to only the items listed in the warrant which could be located on a computer. Because Sin was found in Churchill County, Nevada, maps or other information about that location could have been located in Wong's computer. Evidence of travel arrangements to Nevada could also be found on the computer. Monopoly money depictions or information related to the letters "NWO" and "ZOG" could have been stored on a computer. Maps of or travel information about Churchill County, Nevada, Monopoly money, the letters "NWO" and "ZOG" and Sin's personal correspondence are items directly related to Sin's murder. All of these items could reasonably be found on a computer. Because of Wong's behavior, Tang's threats to Sin, and the fact that Sin had lived in the place to be searched, the magistrate judge had a substantial basis for believing the items listed in the warrant, including those items that could reasonably be located on a computer, could be found in Wong's house or cars. The magistrate judge's determination that probable cause existed for the search of Wong's computers for the other items listed in the warrant is not clearly erroneous.

■ Wong next contends that the January 26 warrant was overbroad. The standard of review for the specificity of a warrant is de novo. *United States v. Noushfar*, 78 F.3d 1442, 1447 (9th Cir. 1996). To determine specificity, we examine both the warrant's breadth and particularity. *United States v. Kow*, 58 F.3d 423, 426 (9th Cir.1995). We consider one or more of the following to determine specificity: (1) whether there was probable cause to seize particular items in the war-

rant, (2) whether the warrant sets out objective standards by which executing officers can determine which items are subject to seizure, and (3) whether the government could have described the items more particularly when the warrant was issued. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986).

■ We have previously held that a search warrant similar to the January 26 warrant was sufficiently specific. *See United States v. Hay*, 231 F.3d 630, 636–38 (9th Cir.2000). Hay appealed the district court's denial of his motion to suppress evidence of child pornography obtained pursuant to a search warrant he claimed lacked specificity. *Id.* at 636–37. Hay claimed the warrant was unconstitutional because police could seize his entire computer system without "referencing child pornography or any particular offense conduct or being narrowed by specific acts, time frames or persons." *Id.* An attachment to the warrant listed computer hardware, computer software, records stored on computer media, and computer instructions. *Id.* at 637. In separate listings, the attachment referenced visual depictions of child pornography and records of the distribution of materials that depict child pornography. *Id.* Child pornography was not included in the items which referred to the particular computer components to be searched. We held that, because the attachment specifically mentioned the crime of child pornography and the preface to the warrant limited the scope of the search to evidence of criminal activity, the warrant was sufficiently particular. *Id.* We did not require a more specific explanation of where the evidence might be located on Hay's computers. *Id.* The warrant did not authorize seizure of any and all documents, but rather was limited to "child pornography which is a sufficiently specific definition to focus the search." *Id.* at 638.

*Compare United States v. Carey*, 172 F.3d 1268, 1272–73 (10th Cir.1999) (where the Tenth Circuit held that police exceeded the scope of the search allowed by the warrant, which specified searching for "names, telephone numbers, ledgers, receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances" and the police opened graphic files. Because the officer could not justify looking for documents in graphic files, but continued to look in these graphic files once child pornography was discovered, the officer expanded the scope of the search and acted "without judicial authority when he abandoned his search for evidence of drug dealing.").

While the specificity issue is a closer call, we ultimately hold that the January 26 warrant was sufficiently specific. We find that all three *Spilotro* factors are satisfied in this case. We have already determined that probable cause existed for the search. Regarding the second factor, we find that the officers were provided with objective standards alerting them to the items which could be seized. As explained in the well-reasoned district court order denying Wong's motion, the January 26 search warrant contained a comprehensive list of twelve items the police expected to find in Wong's home that directly related to Sin's murder. The warrant list included "[a]ny writings or documents which display the letters 'NWO' and 'ZOG' "; "[a]ny maps, reciepts [sic], or writings, depicting Churchill County, Nevada"; and "[a]ny and all identification and documents belonging to Alice Sin." While Item Nine, which requested to search the computer and its components to "obtain data as it relates to this case," did not specify the information police expected to find on the computers or the exact location of the evidence, the content of Item Nine referred to the specific items included in the warrant list. The specificity of the items

listed in the warrant combined with the language in Item Nine directing officers to "obtain data as it relates to this case" from the computers is sufficiently specific to focus the officer's search. As in *Hay*, the computer items were listed separately from the actual evidence the police expected to recover. However, Sergeant Carmichael's attached probable cause statement related the items in the warrant to murder and the face of the warrant itself limited the seizure to items used to commit a felony, to evidence of a felony, or to evidence that a particular person committed a felony. The executing officers would have been aware from the language in Item Nine that they could search the computers only for those particular items previously listed in the warrant. Van Alst, the forensic expert who searched the computer, determined which items in the warrant list could be located on the computers and searched only plain text, special text and graphics files, the only types of files which could contain the data specified in the warrant. He was aware that maps of Churchill County, depictions of Monopoly money, or references to "NWO" or "ZOG" could be found in graphics files on Wong's computer, unlike the documentary evidence being sought in *Carey*. Because the police were on notice that they could only search the computer for the items listed in the warrant, all of which were detailed and specific, the second prong of *Spilotro* is met.

Finally, the items were particularly described in the warrant. The officers specifically referred to documents containing the letters "NWO" and "ZOG" and "any maps, receipts, or writings, depicting Churchill County, Nevada." The government described the items with as much specificity as possible, thereby satisfying the third prong of the *Spilotro* test. According to *Hay*, the specific location the items are expected to be found on the computers is not required in the warrant. *Hay*, 231 F.3d at 637. Van Alst looked only in three types of computer files for the items listed in the warrant. The items in the warrant were sufficiently particular for Van Alst to limit his search to only plain text, special text, or graphics files. Therefore, we hold that the January 26 warrant satisfies the particularity requirement of *Spilotro*. The January 26 search warrant was neither lacking probable cause nor overbroad.

However, because the warrant sought evidence related to murder, one last step must be satisfied. The child pornography seized must have been in plain view during the search for evidence of Sin's murder. To satisfy the plain view doctrine: (1) the officer must be lawfully in the place where the seized item was in plain view; (2) the item's incriminating nature was "immediately apparent;" and (3) the officer had "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (citations omitted). Pursuant to a valid search warrant, Van Alst determined that the items listed in the search warrant which could be located on computer files could be found in plain text, special text, or graphic files. While searching the graphics files for evidence of murder, as allowed by the warrant, Van Alst discovered pictures of children as young as age three engaged in sexual acts. The incriminating nature of the files was immediately apparent to Van Alst. Since the police were lawfully searching for evidence of murder in the graphics files, that they had legitimately accessed and where the incriminating child pornography was located, the evidence was properly admitted under the plain view doctrine.

## B.

Wong's next claim is that the January 28 warrant was fruit of the poisonous tree

and overbroad. Since we have determined that the January 26 warrant is valid, there is no fruit of the poisonous tree issue. *See United States v. Valencia Amezcua,* 278 F.3d 901, 905, 908 (9th Cir.2002) (because the defendant's arrest was not illegal, the challenged evidence found during an inventory of the defendant's clothes was not excluded under the fruit of the poisonous tree doctrine). The second warrant requested a search of "any and all computer files, computer graphic files, computer stored and generated document files" in the seized computers, which were specifically described. The second warrant was more specific than the January 26 warrant because it included additional information in the Addendum that connected the items which could be on the computers to Sin's disappearance. Sergeant Carmichael indicated in the Addendum that he learned, after the first search, that Wong had told his Canadian Safeway colleagues that he would not be returning to the United States because of the investigation of Sin's murder. Sergeant Carmichael stated that during the first search he found information related to casinos in Nevada; knew Wong had internet access which could be used for travel arrangements and research on white supremacy groups; and, based on his experience, knew email could be used to communicate with co-conspirators. Additionally, Sergeant Carmichael included the January 26 with the January 28 warrant as a single application to the magistrate judge, who then specifically incorporated the Addendum into the January 28 warrant. *See United States v. Hillyard,* 677 F.2d 1336, 1340 (9th Cir.1982) (standards guiding police officers executing a search warrant to avoid seizing protected property may be contained in the search warrant itself or in the accompanying affidavit, if it is included with the warrant and incorporated into the warrant). Since we find that the January 26 warrant was sufficiently specific, the January 28 warrant, which included all of the information from the January 26 warrant plus additional information from Sergeant Carmichael, is more than sufficiently specific to satisfy the particularity requirements of the Fourth Amendment. Therefore, the warrant was supported by probable cause, provided objective standards for what could be seized from the computers, and was described with sufficient particularity. *See Spilotro,* 800 F.2d at 963.

## C.

■ Finally, Wong asserts that the February 2, 2000 warrant was fruit of the poisonous tree. Having determined that both the January 26 and January 28 warrants are valid, we conclude that the February 2 warrant is not fruit of the poisonous tree. Additionally, the district court determined, and we agree, that the laptop searched belonged to Wong's former employer Teligent. Therefore, Wong does not have standing to object to the search of that laptop because he failed to establish that he had a reasonable expectation of privacy in it. *See United States v. Cormier,* 220 F.3d 1103, 1108 (9th Cir.2000) (a person does not have a reasonable expectation of privacy in an item in which he has no possessory or ownership interest).

## III.

For the forgoing reasons, we affirm the district court, holding that the January 26, January 28, and February 2 warrants were constitutional.

AFFIRMED.